**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN K. JOHNSTON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:07cv860 |
| | ) | Electronic Filing |
| **FORBES HOSPICE/WEST PENN** | ) | |
| **ALLEGHENY HEALTH SYSTEM**, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

Plaintiff commenced this action seeking redress for alleged wrongful suspension
and subsequent termination from employment based on disparate treatment and
retaliation for complaints about race discrimination.  Presently before the court is
defendant's motion for summary judgment.  For the reasons set forth below, defendant's
motion will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be
granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the
discovery and disclosure materials on file, and any affidavits show that there is no
genuine issue as to any  material fact and that the movant is entitled to judgment as a
matter of law."  Summary judgment may be granted against a party who fails to adduce
facts sufficient to establish the existence of any element essential to that party's claim,
and upon which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett,
477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence
which demonstrates the absence of a genuine issue of material fact.  When the movant
does not bear the burden of proof on the claim, the movant's initial burden may be met
by demonstrating the lack of record evidence to support the opponent's claim.  National
State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992).  Once that
burden has been met, the non-moving party must set forth "specific facts showing that
there is a genuine issue for trial," or the factual record will be taken as presented by the

moving party and judgment will be entered as a matter of law.  Matsushita Electric
Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a),
(e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a
reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242 (1986).

    In meeting its burden of proof, the "opponent must do more than simply show
that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at
586.  The non-moving party "must present affirmative evidence in order to defeat a
properly supported motion" and cannot "simply reassert factually unsupported
allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).
Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in
memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise,
mere conjecture or speculation by the party resisting summary judgment will not provide
a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360,
382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or
lacks sufficient probative force summary judgment must be granted.  Anderson, 477 U.S.
at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358,
1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not
permitted to weigh facts or competing inferences, it is no longer required to "turn a blind
eye" to the weight of the evidence).

    The record as read in the light most favorable to the non-moving party establishes
the background set forth below.  Plaintiff became employed by defendant on December
13, 2004, and worked as a registered nurse providing home hospice care for patients.
Response of Plaintiff to Statement of Material Facts Not in Dispute (Doc. No. 35) at ¶ 3.
Plaintiff worked on an interdisciplinary treatment team known as the "East Team," which
served patients in the Eastern region of Pittsburgh.  Id. at ¶ 7.  Social worker Emma
Castaphney also served on the team.  Id.  The interdisciplinary treatment teams reported
to Leslie Palkofer, Home Care Manager.  Id.  Palkofer in turn reported to Hospice

Director Maryanne Fello. Id.

On June 28, 2006, a series of telephone conversations occurred between a white co-worker, Meghan O'Donnell, and a family member of a patient. Id. at 10. The family member called and relayed that the patient was requesting that certain employees not be sent to the patient's residence. Id. O'Donnell was uncertain about whether the request could be accommodated and thereafter discussed it with Palkofer. Palkofer directed O'Donnell to obtain more information and in that process it was revealed that the patient did not want any African Americans coming into the home. Plaintiff overheard O'Donnell's side of the conversation and became aware of this request. After this telephone call plaintiff confronted O'Donnell about race discrimination and stated that he believed she was being "too nice" to the caller. Id. at ¶ 10. The confrontation escalated and Palkofer became involved. Id. at ¶ 11. After being pressed by Palkofer about his anger over the situation, plaintiff stated he understood "how people get mad at work and take action," and that he did not feel "that in this day and age things like that should happen in the workplace."[1] Id. at ¶ 12. When asked about what he meant, plaintiff referred to events in the news and stated: "I've never experienced any type of anger at work before that made me feel that way, but I could understand after this incident how things do happen." Id. at ¶ 18.

After the June 28 conversation with Palkofer,  plaintiff left to see his last two

---

[1] The parties dispute what plaintiff actually said as well as when he made these statements. Defendant contends plaintiff stated: ""I feel like getting a gun and shooting someone's head off' and that this statement was made a few days after the initial confrontation. Defendant's Statement of Material Fact (Doc. No. ) at ¶ 17.  Plaintiff maintains that he made the statements referenced in the text above on June 28, 2006.  The differences between each party's version are immaterial at summary judgment.  Palkofer admittedly viewed the statement as nothing more than an implied threat and did not believe plaintiff would act on the statement.  Thus, whether Palkofer reported the statements to Human Resources ("HR")  on June 30 instead of June 28 would not change her belief that the statements were made in a non-threatening manner.  And it follows that if she perceived her version of the statements as something that was non-threatening and not a basis to believe plaintiff was going to engage in threatening conduct, the less threatening version alleged by plaintiff necessarily would have been perceived as non-threatening.

patients before going home. Id. at ¶ 13.  Palkofer contacted Fello to discuss the confrontation, plaintiff's complaint about racial discrimination stemming from how O'Donnell handled the telephone call and plaintiff's reaction to the entire incident. Id. Plaintiff called off the next day and arranged to see a counselor, Mr. Shamlin, to discuss the incident. Id. at 15.  During the first session Shamlin made a note indicating plaintiff stated: "I can see why people go and pick up a gun and hurt other people when they are treated this way."[2] Id. at ¶ 16.

On June 30, 2006, plaintiff returned to work and met with Palkofer.  He indicated that he cried "all night long" as a result of the incident. Id. at ¶ 14.  After this meeting Palkofer contacted HR Director Rebecca Trumble (now Conlon) to discuss her concerns about plaintiff's statements.  Id.  at ¶ 20.  After hearing about the statements  Conlon expressed concern for the safety of the patients, staff and plaintiff himself, and instructed Palkofer to refer plaintiff to the Employee Assistance Program ("EAP") for evaluation. Id.  at ¶ 20.  During the EAP evaluation process plaintiff was suspended without pay. Id. at ¶ 21.  Suspension without pay during the evaluation is not a procedure expressly set forth in defendant's written workplace policies.

Later that afternoon, Palkofer met with plaintiff and informed him that he would be suspended until the issue was resolved.  Plaintiff immediately called Forbes' EAP and informed them he was already seeing Shamlin, an EAP counselor, through his wife's employment, and it was agreed he could continue to do so.  Id. at ¶ 23.  The following week plaintiff spoke to Shamlin over the telephone. Id.at ¶ 24.  During the conversation, Shamlin stated he would not release plaintiff to return to work at that time. Id.

On July 7, 2006, plaintiff met with Fello to discuss returning to work.  Id. at ¶ 25. During the meeting Fello promised there would be training with the hospice staff regarding race relations as a result of the June 28, 2006 telephone call. Id.  The next day

---

[2] Shamlin's treatment note dated June 29, 2006 reads "guy" instead of "gun;" however, Shamlin stated in his deposition it was a typographical error and should have read "gun." Id.

plaintiff spoke with Shamlin over the telephone, and Shamlin told him he could be released as soon as Shamlin spoke to the EAP at Forbes. Id. at ¶ 26.  On July 9, 2006, Shamlin wrote a letter that advised: "At the time [plaintiff] was evaluated, he exhibited no signs of intent to harm others and verbalized remorse over his handling of the recent situation and poor judgment in relation to statements he made resulting in the disciplinary action taken." Id. at ¶ 27.

Prior to plaintiff's return to work, social worker Castaphney made a routine visit to a patient's home. Id. at ¶ 28.   The parties differ over the contents of the conversation that took place between Castaphney, the patient's wife and Michelle K.S., the daughter of the patient. Id. at 29.   Defendant alleges the patient's wife and daughter stated they took plaintiff to see their neighbor, Harvey Adams, a lawyer, regarding plaintiff's recent incident at work. Defendant's SMF at ¶ 29.  The family members were upset because plaintiff had not shown up for an appointment he made with Adams. Id.  Defendant also alleges the family members stated plaintiff had asked them for a $150,000 loan to start his own hospice business, and indicated Castaphney and the patient's daughter would be involved in the business venture. Id. at ¶  30.  Castaphney further reported that the family told her they gave plaintiff a car stereo and he borrowed the family's car for a trip to Canada. Id.  at ¶ 31.  Finally, defendant alleges the family requested a new nurse. Id.  at ¶ 30.

Plaintiff and Michelle K.S. allege that no such conversation took place between the family members and Castaphney.  Plaintiff's SMF at ¶ 29.  Specifically, plaintiff alleges that after he was discharged he was put in touch with Adams regarding the incidents, but he only met with Adams prior  to the discharge because he admired him. Id.  Furthermore, Michelle K.S. denies that plaintiff ever asked the family for a loan or that the family requested a new nurse.  Id.  at ¶ 30.  Both plaintiff and Michelle K.S. admit to having discussions about a "business venture," but state it was merely a joke between the family and plaintiff.  Id.  Michelle K.S. also denies ever discussing with Castaphney that plaintiff borrowed the family car for a trip to Canada, or the car stereo.

5

Id. at ¶ 31.  Both plaintiff and Michelle K.S. claim  the car stereo was a gift for Debbie
Johnston, plaintiff's wife, and that she was the one who accepted the family's offer to use
the car for the trip. Id.

Castaphney returned to the office and met with Fello and Palkofer to discuss the
conversation that took place at the patient's home.  Id. at ¶ 32.  After Castaphney
disclosed the contents of the conversation, Fello concluded that the ethics violations were
self-evident and the acceptance of the a car stereo alone was sufficient to warrant
plaintiff's discharge. Id. at ¶ 34. Fello directed Castaphney to prepare a written statement.
Fello then contacted Conlon, who instructed her to call the family and confirm what
Castaphney had  reported.  Brief of Plaintiff at 15.  Notes from Fello's July 11, 2006
telephone call refer only to the solicitation of a loan. Id. After the conversation with the
family, Conlon and Fello concluded that plaintiff should be terminated. Plaintiff's SMF
at ¶ 34.

On July 13, 2006, Fello and Conlon met with plaintiff and told him he was
dismissed.  Id. at ¶ 35.  Plaintiff's discharge letter included as supporting grounds the
receipt of the car stereo, the solicitation of a loan, and the use of the family car. Id. ¶ 34.
During the discharge meeting, plaintiff asserted the charges were not true, but was not
given a chance to give his side of the story.  Plaintiff's SMF at ¶ 36, Plaintiff's Brief at
13.   In response, Fello told him she researched the charges herself and that, "I am the
CEO of Forbes Hospice.  It is your word against my word and my word is final.  You are
fired." Id. On July 13, 2006, following plaintiff's termination, Fello contacted the wife of
the patient for the second time.  Her notes of that conversation again only reference the
solicitation of the loan.  Plaintiff's Brief at 15.

According to plaintiff, discrepancies exist over the reasons given for his
dismissal. Fello has explained that the discharge was based solely on the acceptance of
the car stereo.  Id. at 14 (citing Fello Deposition at 125-126).  Conlon insisted, however,
that the car stereo, the use of the patient's car and the loan solicitation were all taken into
account, and admitted that the use of the car would not have been grounds for discharge

6

by itself. Id. (citing Conlon Deposition at 167, 180).

Debbie Johnston was a friend of Michelle K.S. prior to plaintiff providing hospice care to the patient.   Plaintiff's SMF at ¶ 40.   Plaintiff claims the stereo was a birthday present for his wife, who jointly owns the car with him, and that he had no prior knowledge that the family was planning to give her the stereo. Id. at ¶ 39.   Forbes' Code of Ethics does not address whether family members of an employee can accept gifts from a patient or family members.  Id.  at ¶ 34.  Plaintiff admits to borrowing the patient's vehicle to travel to Canada, but asserts that his wife accepted an offer by the family to borrow the vehicle.  Id.  at ¶ 37.

Prior to the incident on June 28, 2006,  plaintiff had a friendly relationship with O'Donnell and had no problems with anyone in the workplace. Id. at ¶¶ 8-9.  Further, plaintiff was treated with respect and did not believe Palkofer to be racist in any way. Id. at ¶ 8.  Although Castaphney was directed to prepare a written statement when she reported the conversation with the family members to her superiors, she did not create a statement until shortly after plaintiff was discharged.  Id. at ¶ 33. The racial sensitivity and cultural diversity training sessions contemplated by defendant shortly after the confrontation were not held after plaintiff was discharged.

Defendant moves for summary judgment on the grounds that plaintiff has failed to raise a prima facia case for either disparate treatment or retaliation.  From its perspective the record does not contain any evidence that plaintiff's race was taken into account in any adverse employment action.  It likewise will not support a finding that the content of his complaints about the handling of the patient's discriminatory request was a motivating factor in defendant's actions. Consequently, defendant contends that plaintiff lacks sufficient evidence to establish that any of defendant's proffered explanations were pretextual.

Plaintiff argues that a prima facia case for retaliation under Title VII has been established.  See Plaintiff's Brief at 6-8. In addition, he argues that the reasons proffered for his suspension and the discharge are fraught with inconsistences and contradictions.

Thus, the finder of fact would be free to discredit defendant's explanations and find that plaintiff's complaint about race discrimination in the workplace was a motiving factor in the adverse employment decisions.

Plaintiff has failed to produce sufficient evidence to support a claim for retaliation.  In order to establish a prima facia case of retaliation under Title VII, a plaintiff must demonstrate that (1) he or she engaged in protected activity; (2) the employer took adverse employment action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997).  A claim for retaliation under Title VII is evaluated pursuant to the McDonnell Douglas and Burdine burden shifting analysis.

Title VII makes it unlawful for an employer to discriminate against an employee because the employee has made a charge of discrimination or opposed a discriminatory policy or practice. Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006) (Anti-retaliation provision protects those who participate in certain Title VII proceedings and those who oppose discrimination believed to be unlawful under Title VII.); Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997); 42 U.S.C. § 2000e-3(a).  It also protects employees who oppose discrimination through "informal protests of discrimination practices, including making complaints to management." Curay-Cramer v. Ursuline Acad. Of Wilmington, 450 F.3d 130, 135 (3d Cir. 2006).  Its protections are intended to be broad and extend to any form of opposition to practices made illegal by Title VII.  See Crawford v. Metropolitan Gov't of Nashville and David Cty, 129 S. Ct. 846, 851 (2009) (noting that where an employee speaks up about discriminatory conduct in the workplace reported by a fellow employee,  "[t]here is, then, no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the

same discrimination in the same words when her boss asks a question.")

Although Title VII's protections are broad, its anti-retaliatory provision does not protect an employee from all forms of retaliation.  Title VII "does not set forth 'a general civility code for the American workplace.'"  Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal citations omitted).  Furthermore, "simply opposing an employment practice does not rise to the level of a protected activity." Zappan v. Pa Board of Probation and Parole, 152 Fed. Appx. 211, 218 (3d Cir. 2005) (citing Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 271 (2001).  Instead, the employee must hold an objectively reasonable belief, in good faith, that the challenged activity violates Title VII.  Clark County, 532 U.S. at 271.

The employment action taken by the employer must be materially adverse and produce an injury or harm. Burlington Northern and Santa Fe Ry. Co., 548 U.S. 67-68. An employment action is materially adverse where "it might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

The record also must contain sufficient evidence from which the finder of fact can link the materially adverse action to retaliatory animus.  Moore, 461 F.3d at 346.  Two central factors are brought into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any " 'pattern of antagonism in the intervening period.' " Id. (quoting Abramson, 260 F.3d at 288 (quoting Woodson, 109 F.3d at 920-21)). "Timing alone raises the requisite inference when it is "unusually suggestive of retaliatory motive." Id.  "But even if 'temporal proximity ... is missing, [it is appropriate to]  look to the intervening period for other evidence of retaliatory animus." Id. (quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997)).  However, "[t]hese are not the exclusive ways to show causation" and it is important to consider all of the proffered evidence as a whole to determine whether it "may suffice to raise the inference." Id.  (quoting Farrell, 206 F.3d at 280 and citing in support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The

9

element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific.")).

Finally, if the plaintiff proffers sufficient evidence to establish a prima facia case, the burden shifts to the defendant to advance a legitimate explanation for any treatment brought into question.  If the employer meets that burden, the plaintiff must come forward with sufficient evidence to "overcome the non-retaliatory explanation" and permit a finding of retaliatory discrimination. Id.

The gravamen of plaintiff's complaint is that O'Donnell was "too nice" to a family that would make a request that employees of color not be sent to the patient's home.  Id. at 7.  The issue presented is thus whether an reasonable employee could objectively perceive O'Donnell's responses to the patient's inquiry as having the import of establishing a policy or edict in defendant's allocation of hospice services that violated Title VII.

As previously noted, Title VII's anti-retaliation provision does not extend to every form of unlawful discrimination.  In other words, "not every act by an employee in opposition to [some form of prohibited] discrimination is protected.  The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." Wimmer v. Suffolk County Police Dept., 176 F.3d 125, 135 (2d Cir. 1999) (quoting Silver v. KCA, Inc., 586 F.2d 138,141 (9th Cir. 1978)).  In other words, to be unlawful under Title VII the act of discrimination or harassment must be one attributable to the employer and directed toward someone who is in an employment relationship with the employer or arise in the employment relationship. Id. at 136 ("It is inherent in the definition of a racially hostile work environment, however, that the person against whom the hostility is directed must be in an employment relationship with the employer.") (citing Bermudez v. TRC Holdings, Inc., 138 F.3d 1176, 1180 (7th Cir.1998) (rejecting retaliation claim of a Caucasian female where she alleged she was fired for opposing race-based practices in an employment agency generally but did not allege that she "was retaliated against for sticking up for the rights

of black co-workers or clients")). This is because "[t]he specific evil at which Title VII was directed was not the eradication of all discrimination by private individuals, undesirable though that is, but the eradication of discrimination by *employers against employees.*" Silver, 586 F.2d at 141 (emphasis added).

Plaintiff cannot show that the requests by the patient, the portion of O'Donnell's conversation he overheard and/or the statements exchanged in the confrontation that followed reflected an activity or practice by his employer that could reasonably and in good faith be perceived by an objective employee to be a violation of Title VII. The very manner in which the events unfolded in front of plaintiff makes clear that this single, isolated response by a co-worker to a misplaced patient request will not support a finding that plaintiff engaged in conduct that was protected by the opposition clause of Title VII's anti-retaliation provision.

O'Donnell was one of plaintiff's co-workers and merely was performing a routine duty when she fielded the telephone call wherein it was relayed that the patient was requesting that certain employees not be sent to the home. O'Donnell indicated she was unsure whether the request could be accommodated. O'Donnell relayed the patient's request to management. The specifics of what was being requested initially were unclear and Palkofer directed O'Donnell to obtain additional information. It then became clear that the patient was requesting no African-Americans be sent to the patient's home. O'Donnell relayed the clarification to management.

It is undisputed that O'Donnell did not have the authority to grant or deny the patient's request and once O'Donnell's superior – who did have that authority – became aware of the repugnant nature of the request, the request was denied. At no point during this fleeting event was there any basis to believe that an individual on defendant's management team who could establish policy and procedure for employees was giving meaningful consideration to a request for the assignment of hospice services based on the race of the employee. Thus, the only policy or protocol established by defendant was that hospice services would not be provided in a manner that would take race into account.

Under these circumstance  no reasonable employee could objectively believe that O'Donnell's handling of the patient's request amounted to a discriminatory policy or practice that was established or sanctioned by defendant.  Furthermore, plaintiff has not proffered any evidence from which a reasonable juror could conclude that defendant ever gave any meaningful consideration to putting such a practice into force.  Consequently, plaintiff  has failed to proffer sufficient evidence to satisfy the first element of his retaliation claim.

Other courts have reached the same conclusion under similar factual settings.  In Silvers, Sandra Silver worked for KCA, Inc., and her responsibilities included training an African-American, John Spencer.  Silver, 586 F.2d at 140.   Silver shared a work area with Robert Warrington, a white co-worker.  Id.  One day Silver noticed equipment had not been cleaned and complain out loud, stating she would have to come in over the weekend to clean it.  Id.  In response to this comment, Warrington stated, "Why don't you let that jungle bunny do it?" and indicated he was referring to Spencer – who was not present.  Id.  After informing Spencer of this comment, Silver, Spencer and another black co-worker confronted Warrington and demanded he apologize.  Id.

The Court of Appeals for the Ninth Circuit concluded the record was devoid of evidence that Warrington's statement amounted to an apparent or potentially discriminatory "unlawful employment practice of an employer."  Id.  at 141.   It observed that no "practice" of any kind by KCA was involved.  Id.

Silver argued that the statute properly should be extended to cover opposition to "a racially derogatory incident."  The panel rejected this interpretation, reasoning that "[w]ere we to follow Silver's argument, however, and extend the protection of the statute to the situation in which no employment practice of an employer was involved, but only an isolated incident between co-workers, we would clearly exceed the intent of Congress and the plain language of the statute.  This we cannot do." Id.  It concluded that "[a] single unauthorized act of discrimination by a co-worker has never been held to justify 'opposition' in the sense of protecting a protesting employee from employer discipline."

Id. at 142.

It follows a fortiori that a co-worker's fielding of a single telephone request by a third party for the provision of hospice services based on race cannot provide the foundation for concluding that an employment practice made unlawful under Title VII was afoot in the workplace.  Nor can a single confrontation between co-workers about the proper way to respond to such a request.  To do so would expand Title VII's protections well beyond the employer/employee relationship without statutory justification for doing so.

Similarly, in Clark County, the plaintiff was in a meeting with her male supervisor and a male co-worker.  Clark County, 532 U.S. at 269.  They were reviewing psychological evaluation reports of job applicants.  Id.  One of the applicant's reports revealed that the applicant  previously said to a female co-worker:  "I hear making love to you is like making love to the Grand Canyon."  Id.  The plaintiff's supervisor read this comment aloud, looked at the plaintiff and said, "I don't know what that means."  Id.  The male co-worker replied, "I'll tell you later," and both men laughed at the comment.  Id.  The plaintiff complained of these remarks to another supervisor, and subsequently was terminated.  Id. at 270.  She then filed a Title VII retaliation claim.  Id.

The Supreme Court affirmed the lower court's decision to grant the defendant's motion for summary judgment, concluding that  "[n]o reasonable person could have believed that the single incident of alleged sexual harassment violated Title VII," [which in turn] "preclud[ed a] retaliation claim based on employee's internal complaints about incident…" Id. at 268.  The Court further observed: "The ordinary terms and conditions of [plaintiff's] job required her to review the sexually explicit statement in the course of screening job applicants. Her co-workers who participated in the hiring process were subject to the same requirement…" Id.  at 271.  The  meeting thus amounted to an "isolated inciden[t]" and the plaintiff was not terminated for activity protected under Title VII.  Id.

Here, plaintiff complained about a single incident where a patient requested the

13

provision of hospice services based on race.  He became angry because a co-worker was not more stern and forceful in responding to the request. As an individual who obviously cares deeply about the social implications of such matters, he became angry because the co-worker "was too nice" to the family member conveying the request.  But Title VII does not mandate that an employee be treated to a pleasant and conflict free workplace. As previously noted, the Court has repeatedly emphasized that Title VII "does not set forth 'a general civility code for the American workplace.'"  Burlington Northern, 548 U.S. at 68.  While plaintiff's experience was no doubt unpleasant, this single incident involving a patient's expression of racism simply will not support the weight plaintiff seeks to assign to it.

Plaintiff also fails to meet his burden of proffering sufficient evidence to support a race discrimination claim.  Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's ... race."  42 U.S.C. § 2000 e-2 (a) (1).  The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment.'"  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).

It is well-settled that claims of discrimination based on circumstantial evidence are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  Under this framework the parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facia case of discrimination. Second, if the plaintiff succeeds in proving

> the prima facia case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981) (citation omitted).

Under the indirect evidence approach a plaintiff must present a prima facia case of discrimination. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). The major purpose of the prima facia case is to eliminate the most obvious lawful explanations for the defendant's adverse employment action and raise a presumptive inference of discrimination. Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352 (3d Cir. 1999) (citing Burdine, 450 U.S. at 253-54 ("[t]he prima facia case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")). A prima facia case raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facia case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facia case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco, 438 U.S. at 577.

If the plaintiff presents a prima facia case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the

adverse employment action at issue. <u>Keller</u>, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." <u>St. Mary's Honor Center</u>, 509 U.S. at 509. If the defendant meets this burden, the presumption of discrimination created by the prima facia case "drops" from the case. <u>Id.</u> at 511; <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. <u>Jones</u>, 198 F.3d at 410. At this juncture the plaintiff must be afforded the "opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." <u>Burdine</u>, 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." <u>St. Mary's Honor Center</u>, 509 U.S. at 515. This is because while the burden of production under the <u>McDonnell Douglas</u> analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Jones</u>, 198 F.3d at 410 (<u>quoting</u> <u>Burdine</u>, 450 U.S. at 252-53 (1981)).

In general, a plaintiff may establish a prime facia case by demonstrating that (1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably. <u>See</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 510 (2002); <u>see also</u> <u>Sheridan v. E. I. DuPont de Nemours & Co.</u>, 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (<u>en banc</u>), <u>cert</u>. <u>denied</u>, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facia case). The central focus of the inquiry is always whether the employee is being treated less favorably because of race, religion, sex or national origin.

Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)).  The plaintiff ultimately must be able to produce "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."  Id. at 355.  (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

Plaintiff has failed to come forward with any evidence to support a finding that his race was a motivating factor in either of defendant's decisions to suspend and terminate him.  He has failed to identify any circumstantial evidence which would support an inference that he was viewed or treated differently because of his race.  Thus, he cannot meet his burden of establishing a prima facia case for disparate treatment on account of race.

The entire incident arose out of a confrontation in the workplace between two co-workers that did not involve a practice or procedure falling within the ambit of Title VII's protections.  Plaintiff has not produced any evidence suggesting plaintiff was treated differently than another employee  outside the protected class under similar circumstances.  In fact, plaintiff has not pointed to any evidence that raises an inference that his race was taken into account by defendant in reaching its decisions to suspend and terminate him.

Moreover, defendant has come forward with a legitimate explanation for the adverse actions taken: concerns of workplace safety for plaintiff and his co-workers and ethical violations involving the solicitation and receipt of gifts/use of property from a client.  Thus, the focus is on the grounds advanced by defendant and the burden shifts to plaintiff to come forward with sufficient evidence to support a finding of pretext.  See Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005) ("Determining pretext is a fact-based inquiry. ... We must, therefore, look carefully at each of Met-Pro's proffered reasons as well as Kautz's claim of pretext regarding each of these reasons." ) (citing Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 646 (3d Cir. 1998) and Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 524-525 (3d Cir.1992)

(concluding that a district court is obligated to focus on the employer's articulated reasons in conducting the fact-based inquiry of determining whether proffered evidence is sufficient to support a claim of pretext)).

Plaintiff seeks to establish pretext by pointing to discrepancies underlying defendant's explanations and /or in taking actions not necessarily authorized by defendant's workplace disciplinary policies.  However,  "[t]o discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes, 32 F.3d at 765.  Instead, the plaintiff must come forward with evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Id. (citations omitted).  In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reason is unworthy of credence.  Id. at 764.

Plaintiff's attempt to generate evidence of pretext from the discrepancies between defendant's and his version of the statement concerning workplace violence is misplaced.  Plaintiff does not deny that he made a statement reflecting his significant anger over the request and how it was fielded.  Nor does he challenge in any meaningful way defendant's ability to insist that he undergo counseling in conjunction with that statement. In fact, he had already sought counseling on his own initiative because of the residual anger and emotions he had experienced on the heels of the incident.  He cites no other incident were an employee engaged in similar behavior and was not suspended pending the completion EAP counseling.  Merely quarreling with when the statement was made and what the actual language was of his admitted expression of anger does not

18

supply evidence that defendant lacked justification for the action taken or acted on an improper motive in taking the action. It is undisputed that the statement was made before plaintiff was suspended and directed to EAP counseling.  Defendant was not required to make an immediate decision about the proper response to plaintiff's conduct.  And the fact that Palkofer did not take notes about the incident does not undermine the basis for defendant's actions or raise an inference of some nefarious motive at work.  See Parker v. Verizon Pennsylvania, 309 Fed. Appx. 551, 557 (3d Cir. 2009) (employee's mere denial that his conduct did not violate the employer's reporting requirements was insufficient to establish pretext because such evidence merely created a material issue as to "whether the decision was wrong, not discriminatory."); Constant v. Mellon Financial Corp., 247 Fed. Appx. 332, 338 (3d Cir. 2007) (A plaintiff's own assessment of his or her work performance is inapposite to a pretext analysis because the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer's decision was wrong, mistaken, imprudent or incompetently made) (citing Ezold, 983 F.2d 529 and Fuentes, 32 F.3d at 765 in support).

Plaintiff's efforts to undermine defendant's proffered explanation concerning his discharge suffers from similar shortcomings.  He does not deny receiving the car stereo, borrowing the car for a trip to Canada, or engaging in a conversation with the family that raised a scenario of starting a hospice home care business.  Thus, the notion that defendant could have manufactured these reasons as implicitly suggested by plaintiff's and Michele K.S.'s denial that a conversation between the family and Castaphney ever occurred is of little probative force due to plaintiff's acknowledgment that there was a historical basis for each ground cited by defendant in the discharge letter.

Moreover, the fact that Conlon and Fello differed on which of the three grounds should be recognized as the most significant or as the basic reason for the action taken does not undermine the grounds for defendant's action in any significant way or raise the specter of an illegal motive. While Plaintiff  has identified certain discrepancies or differences in the amount of emphasis each particular supervisor placed on each of the

three specific ethics violations referenced in plaintiff's discharge letter,  he does not advance any evidence from which the inference can be drawn that defendant did not act for the reasons given and instead treated plaintiff adversely because of his race.  See Kautz, 412 F.3d at 467-8 ("We have applied the principles explained in Fuentes to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.") (citing Stanziale v. Jargowsky, 200 F.3d 101, 106 (3d Cir.2000) and Keller, 130 F.3d at 1110 in support).  And the highlighted discrepancies between Fello and Conlon regarding whether Michele K.S.'s friendship with plaintiff's wife should have been made known to defendant and the import of the gift of the car stereo do not contradict the core facts underlying defendant's proffered explanation or cast doubt on defendant's explanation to a degree that will permit an inference that plaintiff's race was the real reason for the discharge.  Nor does the fact that any notes made by Fello referenced only the reported business venture plaintiff admittedly raised with the family.  The lack of notes about the car stereo or borrowing the family car does not provide persuasive evidence that such matters were not considered by defendant in making its decision. See Kautz, 412 F.3d at 468 (absent evidence suggesting an employer used criteria which lacks any relationship to the employee conduct or criteria being evaluated, it is improper to second guess the measures an employer uses to evaluate an employee's performance) (citing Simpson, 142 F.3d at 647, Keller, 130 F.3d at 1109, Healy v. New York Life Ins. Co., 860 F.2d 1209, 1216 (3d Cir.1988) ("[O]ur inquiry must concern pretext, and is not an independent assessment of how we might evaluate and treat a loyal employee."), and Logue v. International Rehabilitation Associates, Inc., 837 F.2d 150, 155 n. 5 (3d Cir. 1988) ("[O]ur task is not to assess the overall fairness of [the] ... employer's actions.")).  Such shortcomings are

fatal to any disparate treatment claim plaintiff is advancing.[3]

For the reasons set forth above, defendant's motion for summary judgment will be granted.  An appropriate order will follow.


Date: September 15, 2009


                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge


cc:      Lawrence R. Chaban, Esquire
         330 Grant Street
         2727 Grant Building
         Pittsburgh, PA 15219

         Thomas B. Anderson, Esquire
         Thomson Rhodes & Cowie, PC
         Two Chatham Center, 10th Floor
         Pittsburgh, PA 15219

---

[3]The same analysis set forth above would follow if it were necessary to reach the pretext stage on plaintiff's retaliation claim.  Consequently, summary judgment would have to be granted as to that claim on this alternative basis as well.